IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARK B. ETHRIDGE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. 11-543 |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| COMMISSIONER OF SOCIAL | ) |
| SECURITY, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

**INTRODUCTION**

Plaintiff, Mark B. Ethridge, seeks judicial review of a decision of Defendant, Commissioner of Social Security ("the Commissioner"), denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI, respectively, of the Social Security Act, 42 U.S.C. §§ 401-433 and §§ 1381-1383f.[1]  Presently before the Court are the parties' cross-motions for summary judgment pursuant to Fed.R.Civ.P. 56.  For the reasons set forth below, Plaintiff's motion for summary judgment will be denied,

---

[1] The Social Security system provides two types of benefits based on an inability to engage in substantial gainful activity: the first type, DIB, provides benefits to disabled individuals who have paid into the Social Security system through past employment, and the second type, SSI, provides benefits to disabled individuals who meet low-income requirements regardless of whether the individuals have ever worked or paid into the Social Security system.  With respect to Plaintiff's claim for DIB, he acquired sufficient quarters of coverage through past employment to remain insured through December 31, 2010.  (R. 104).  Therefore, to be eligible for DIB, Plaintiff must establish that he became disabled before that date.

1

and the Commissioner's cross-motion for summary judgment will be granted.

**PROCEDURAL HISTORY**

Plaintiff filed applications for DIB and SSI on August 25, 2008, alleging disability since January 26, 2008 due to a left hip replacement, right hip problems, arthritis in both shoulders and bursitis in the left elbow.[2]  (R. 166-72, 173-75, 180). Following the denial of Plaintiff's applications on November 6, 2008, he requested a hearing before an administrative law judge ("ALJ").  (R. 121-24, 125-29, 130-32).  Plaintiff, who was represented by counsel, testified at the hearing which was held on June 30, 2010.  A vocational expert ("VE") also testified. (R. 26-45).

The ALJ issued a decision on July 16, 2010, denying Plaintiff's applications for DIB and SSI based on a determination that, despite severe impairments, Plaintiff retained the residual functional capacity ("RFC") to perform

---

[2] On May 24, 2006, Plaintiff filed applications for DIB and SSI alleging disability beginning October 31, 2005 due to a left hip replacement resulting from Stage VII avascular necrosis, status post right hip cord depression with trabecular screw resulting from Stage I avascular necrosis, left shoulder rotator cuff tendonitis and right shoulder degenerative arthritis.  Following a hearing, an ALJ issued a decision on January 25, 2008 denying Plaintiff's applications.  (R. 104-12).  Plaintiff's request for review was denied by the Appeals Council and he apparently did not file an appeal to the district court.  Thus, the ALJ's decision dated January 25, 2008 became final and binding and the earliest date on which Plaintiff may allege disability with regard to his current DIB and SSI applications is January 26, 2008.  (R. 16).

work existing in significant numbers in the national economy.[3]
(R. 16-29).  Plaintiff's request for review of the ALJ's
decision was denied by the Appeals Council on April 1, 2011.
(R. 1-6, 11-12).  Thus, the ALJ's decision became the final
decision of the Commissioner.  This appeal followed.

**BACKGROUND**

Plaintiff's testimony during the hearing before the ALJ in
June 2010 may be summarized as follows:

Plaintiff's date of birth is February 21, 1972.  At the
time of the hearing, Plaintiff resided with his parents.  With
respect to education, Plaintiff did not complete the 10th grade
and he has never obtained a General Equivalency Diploma.
Between 1990 and 2005, Plaintiff was employed as a plasterer.[4]
(R. 84-85).

Plaintiff underwent a left hip replacement in 2006 and a
right hip replacement in 2007.[5]  Plaintiff's left hip squeaks
when he bends, and, a year before the hearing in June 2010,

---

[3] The Social Security Regulations define RFC as the most a disability claimant
can still do despite his or her physical or mental limitations.  See 20
C.F.R. §§ 404.1545(a), 416.945(a).

[4] Plaintiff's earnings record shows no earned income since 2005.  (R. 176-78).

[5] As noted in footnote 2, Plaintiff's severe hip problems were due to avascular
necrosis which can be caused by heavy alcohol consumption.  (R. 209-10, 252).
Avascular necrosis is a disease resulting from the temporary or permanent
loss of blood supply to the bones.  Without blood, the bone tissue dies and,
ultimately, the bone may collapse.  Excessive alcohol use is a common cause
of avascular necrosis.  People who drink alcohol in excess can develop fatty
substances that may block blood vessels, causing a decreased blood supply to
the bones.  www.niams.nih.gov/health_info.

Plaintiff dislocated his right hip when he fell in the shower.[6] (R. 86, 89-90, 93). Plaintiff, who is right handed, also has problems with his shoulders. The left shoulder, which has a torn rotator cuff, bothers Plaintiff more than the right shoulder. Plaintiff has had cortisone injections in both shoulders to obtain relief from the pain. He has been advised that the next step for his left shoulder is surgery. (R. 86-87). Plaintiff's pain is exacerbated by rain and cold weather.[7] (R. 95). At the time of the hearing, Plaintiff was not taking any prescribed medications. (R. 88-90).

Plaintiff smoked a pack of cigarettes a day, and he had stopped drinking a month before the hearing. (R. 88-89). With respect to limitations, Plaintiff can walk a few blocks and stand for 15 to 20 minutes before he has to sit down to rest.[8] If he sits too long, Plaintiff has to get up and stretch. Due to his shoulder problems, Plaintiff tries not to reach to lift anything.[9] (R. 90-91). With respect to activities, Plaintiff

---

[6] Apparently, Plaintiff was intoxicated when he fell. (R. 238).

[7] Plaintiff testified that a few times a month his pain is so severe that he has to lie down. In this connection, Plaintiff's counsel asked him: "... if you had a job, ..., that didn't require you to really do a whole lot physically, when you are feeling pain, like you were just describing, those two to three times a month, would you have to call off because of that pain?" Plaintiff responded: "Yes." (R. 95-96).

[8] Plaintiff testified that he was given a cane following his hip surgeries and that he uses the cane to relieve pressure when he is standing or walking too long. (R. 87-88).

[9] During the hearing, Plaintiff was asked by his counsel how long he could perform a seated job if it required some amount of reaching. Plaintiff responded as follows: "Maybe an hour or two, I don't know if even an hour, I mean, that bothers me right there already." (R. 94-99).

4

takes short walks; he goes to the store; and he is visited by
friends.   Plaintiff has no hobbies.   (R. 91-93).

**VE TESTIMONY**

The ALJ asked the VE whether there were jobs a hypothetical
person of Plaintiff's age, education and work experience who was
limited to sedentary work that did not involve extended reaching
and permitted a sit/stand option could perform.   The VE
responded affirmatively, identifying the jobs of a telephone
solicitor, a cashier and a ticket seller.   If, in addition, the
hypothetical person should avoid repetitive handling and
fingering, the VE testified that the only sedentary job
previously identified that he or she could still perform is the
job of a telephone solicitor.   If, in addition, the hypothetical
person needed a 15-minute break every 1½ hours, the VE testified
that he or she would not be employable.   In response to a
question by Plaintiff's counsel, the VE testified that a
hypothetical individual who needed to call off work 2 to 3 days
a month due to pain could not maintain employment.   (R. 97-100).

**MEDICAL EVIDENCE**

The administrative record in this case includes the
following medical evidence:[10]

---

[10] The sole argument raised by Plaintiff in support of his motion for summary
judgment relates to the limitations resulting from his shoulder problems.   As
a result, the Court's summary of the medical evidence will be limited, in
large part, to Plaintiff's treatment for shoulder pain.

The record of an office visit at Premier Medical Associates on September 10, 2007 includes right shoulder pain among the doctor's assessment of Plaintiff's medical problems. Physical therapy ("PT") is mentioned in the record. (R. 219-20).

The record of Plaintiff's next office visit at Premier Medical Associates on October 8, 2007 indicates that Plaintiff continued to complain of right shoulder pain that was interfering with his ability to sleep; that his range of motion ("ROM") in the right shoulder was limited; that an MRI of his right shoulder recently had been performed; and that he was scheduled to see Dr. Michael Rogal, an orthopedic surgeon, in a few days.[11] (R. 215-16).

By letter dated December 17, 2007, Dr. Rogal informed Plaintiff that he had rotator cuff tendinitis in the left shoulder and severe arthritis in the right shoulder. Plaintiff was given a slip for PT and instructed to take ibuprofen for pain, stretch, apply heat for stiffness and cold for overuse and avoid activities that aggravated his shoulders. (R. 238). Plaintiff attended six PT sessions at the Centers for Rehab Services between December 20, 2007 and January 15, 2008. (R. 239-49).

---

[11] Dr. Rogal is the orthopedic surgeon who performed Plaintiff's hip replacements in May 2006 and July 2007. (R. 256-57, 261-62).

In an office note dated March 24, 2008, Dr. Rogal noted
that Plaintiff continued to experience shoulder pain - left
greater than right.  He also complained of left elbow pain from
leaning on his elbow.  An x-ray of Plaintiff's left elbow was
negative, and Dr. Rogal's diagnosis was left olecranon bursitis.
As to Plaintiff's shoulder problems, Dr. Rogal's impression
included "[p]ersistent pain in the left shoulder with rotator
cuff tendonitis and impingement syndrome" and "[m]oderately
severe right shoulder degenerative arthritis with probably (sic)
anterior dislocation in 1992 and a Hill-Sachs lesion
posterolaterally."  Dr. Rogal ordered an MRI of Plaintiff's left
shoulder.  (R. 250).

The findings of the MRI of Plaintiff's left shoulder, which
was performed on April 22, 2008, were consistent with shoulder
impingement and included advanced degenerative arthosis of the
AC joint, moderate subacromial and subdeltoid bursitis,
sclerosis of the anterolateral margin of the acromion, rotator
cuff tendinopathy throughout the supraspinatus and infraspinatus
with a central cuff tear involving the middle third of the
supraspinatus tendon, mild myotendinous junction edema of the
infraspinatus, advanced tendinopathy of the subscapularis,
articular sided partial tearing, tendinopathy of the long head
of the biceps, and a small cyst beneath the biceps groove.  (R.
313-14).

On June 10, 2008, Plaintiff presented to the Emergency Room of UPMC McKeesport reporting that he got lime in his left eye the previous day while renovating his girlfriend's house. He was given a prescription and instructed to follow-up with his primary care physician and ophthalmologist. (R. 267-68).

An office note by Dr. Rogal dated August 28, 2008 indicates that Plaintiff showed up for his appointment inebriated and security had to be called. The note also indicates that Plaintiff had shown up for office visits inebriated on numerous occasions. Plaintiff was instructed by Dr. Rogal's staff that they would send his records "wherever he would like to go for his followup."[12] (R. 324). The next day, Plaintiff called the office of Dr. Rudolph Antoncic requesting referral to an orthopedic specialist for a cortisone shot.[13] (R. 272).

On October 20, 2008, Dr. Wendy M. Helkowski performed a consultative disability examination of Plaintiff.[14] In her report, Dr. Helkowski noted that Plaintiff's chief complaints

---

[12] Despite a significant history of alcohol abuse, the ALJ found that alcoholism was not a material factor in the determination of disability because the residual effects of Plaintiff's musculoskeletal conditions exist independently of his history of alcohol abuse. Moreover, there was no evidence of blackouts, delirium tremors or other indications of severe alcoholism. (R. 19).

[13] Plaintiff's initial visit with Dr. Antoncic occurred on June 17, 2008. The doctor's assessment was hepatomegaly (a swelling of the liver beyond its normal size) and probable early chronic obstructive pulmonary disease. Full blood work was ordered for Plaintiff. (R. 272). An abdominal x-ray on July 29, 2008 showed "probable fatty infiltration of the liver" and a pulmonary function test the same day was normal. (R. 269, 271). An office note dated November 18, 2008 indicates that Dr. Antoncic "pleaded" with Plaintiff to stop smoking and drinking completely. (R. 297).

[14] Dr. Helkowski is Board certified in Physical Medicine and Rehabilitation.

were bilateral hip and shoulder pain.  With respect to his

shoulder pain, Plaintiff reported that cortisone injections in

the past had provided moderate relief; that he was unable to

elevate his left arm due to pain and weakness from rotator cuff

tendonitis; and that he had not achieved good results from PT.

Plaintiff's physical examination revealed right shoulder flexion

of 80° (0° - 150°, abduction of 80° (0° - 150°) and normal

internal and external rotation, and left shoulder flexion of 30°

(0° - 150°, abduction of 30° (0° - 150°), internal rotation of

10° (0° - 40°) and external rotation of 30° (0° - 90°).  With

regard to motor power, Dr. Helkowski's testing revealed 5/5

strength throughout Plaintiff's upper extremities including

deltoids, biceps and wrist extensors and flexors.  Plaintiff's

grip strength was 4/5 bilaterally with associated pain in his

hands due to a skin condition.  Plaintiff's fine dexterity was

normal bilaterally.  In her Impression, Dr. Helkowski noted,

among other things, that Plaintiff's bilateral shoulder problems

"would prevent him from performing activities including handling

or lifting with the upper extremities."   (R. 273-76).  In a

Medical Source Statement of Claimant's Ability to Perform Work-

Related Physical Activities, Dr. Helkowski opined that Plaintiff

could occasionally lift and carry 10 pounds; could stand and

walk 1 to 2 hours in an 8-hour workday; could sit for 8 hours in

an 8-hour workday with a sit/stand option; had an unlimited

ability to push and pull with his upper and lower extremities; could occasionally bend and climb stairs but never stoop, crouch or balance; and could not reach or engage in repetitive handling and fingering due to his shoulder problems. (R. 277-78).

On November 3, 2008, a non-examining, non-medical State agency adjudicator completed a Physical RFC Assessment for Plaintiff based on a review of the administrative file.[15] The adjudicator opined that Plaintiff could lift and carry 10 pounds; could stand and/or walk at least 2 hours in an 8-hour workday; could sit about 6 hours in an 8-hour workday; had an unlimited ability to push and pull with his upper and lower extremities; could occasionally climb, balance, stoop, kneel, crouch and crawl; had no limitations with regard to reaching in all directions (including overhead), handling, fingering and feeling; and had no environmental limitations.[16] (R. 279-82).

On December 16, 2008, Plaintiff was seen by Dr. Michael Tranovich of Pittsburgh Bone & Joint Surgeons, P.C. for

---

[15] As noted by the ALJ in his decision, the adjudicator's Physical RFC Assessment does not qualify as a medical opinion because he is not a medical professional. (R. 26).

[16] The adjudicator found Plaintiff's complaints of pain only partially credible. With respect to Plaintiff's shoulder problems, he noted that Plaintiff reported "good pain relief from shoulder injections" and "takes Ibuprofen and Aleve to relieve pain." As to the differences between his Physical RFC Assessment of Plaintiff and Dr. Helkowski's opinions concerning Plaintiff's work-related physical limitations, the adjudicator stated that Dr. Helkowski's opinions were inconsistent with the totality of the evidence in the file and an overestimate of the severity of Plaintiff's functional restrictions. Interestingly, the adjudicator only refers to Dr. Helkowski's opinions regarding the limitations in Plaintiff's ability to sit, bend, kneel, stoop, crouch and balance. He does not mention Dr. Helkowski's opinions regarding the limitations resulting from Plaintiff's shoulder problems, i.e., reaching, handling and fingering. (R. 284).

complaints of pain and tenderness in his left shoulder.
Plaintiff reported that he had been diagnosed with a rotator
cuff tear and received cortisone injections in the past, and
that he had experienced episodic pain and tenderness for over a
year that was exacerbated by overhead activity and movement.
Plaintiff's physical examination revealed prominence of the AC
joint in the left shoulder; abduction limited about 10° (0° -
150°); positive impingement sign; exquisite tenderness over the
greater tuberosity; and mild superior riding of the humeral
head.  No impression or plan was included in the record of this
office visit.  (R. 311-12).

Plaintiff's next office visit with Dr. Tranovich took place
on November 5, 2009.  At the time, Plaintiff complained of hip,
shoulder and hand pain and numbness.[17]  Plaintiff's physical
examination revealed psoriasis over the dorsal aspect of his
hands, marked pitting of his nails, restricted ROM of the MCP
and PIP joints of his fingers; and overall stiffness.  An anti-
inflammatory medication was prescribed for the psoriasis.  (R.
309-10).  A month later, Plaintiff was seen by Dr. Tranovich for
a complaint of right knee pain.  At that time, Plaintiff
continued to report multiple musculoskeletal problems as well as

---

[17] With respect to the length of time between office visits, Dr. Tranovich
noted that Plaintiff had elected to see Dr. Rogal for his follow-up care
after his initial visit with Dr. Tranovich in December 2008.

psoriasis and psoriatic arthritic changes in his hands.  (R. 307-08).

During an office visit with Dr. Rogal on January 8, 2010, Plaintiff complained of mechanical left shoulder pain, stiffness in his hands, occasional pain in his hips and pain over a "bump" in the palm of his right hand.  X-rays of Plaintiff's hands showed some carpometacarpal joint degenerative arthritis and x-rays of Plaintiff's left shoulder showed some moderate acromioclavicular degenerative arthritis.  Dr. Rogal's assessment included moderately severe right shoulder degenerative arthritis with probable anterior dislocation in 1992 and Hills-Sachs lesion posterolaterally; impingement syndrome of the left shoulder; bilateral flexor tendinitis of the hands; and a neuroma of the median nerve of the right palm with a small mass.  As to his plan for Plaintiff, Dr. Rogal indicated that he would order an MRI or remove the mass on Plaintiff's right palm if it began to cause pain or increased in size; he would approve Plaintiff for Social Security disability; and he would continue conservative treatment for Plaintiff's left shoulder impingement and flexor tendinitis of the hands. (R. 321).

By letter dated January 8, 2010, Dr. Rogal informed Plaintiff that he had impingement syndrome of the left shoulder and instructed him to stretch to avoid a frozen shoulder, to

apply heat for stiffness and ice after overactivity, to avoid
strenuous physical mechanical activity and to take ibuprofen.
Dr. Rogal also informed Plaintiff that the bump on his right
palm was probably a small neuroma and that he had flexor
tendinitis.  Dr. Rogal instructed Plaintiff to stretch his hand
by pulling his fingers backward, to avoid repetitive strenuous
mechanical activity with the fingers and to take ibuprofen.  (R.
323).

In a Medical Assessment Form completed for the Pennsylvania
Department of Public Welfare on January 8, 2010, Dr. Rogal
opined that Plaintiff had been disabled since 2005 and a
candidate for DIB or SSI due to bilateral total hip
replacements, a neuroma in his right palm, right shoulder
osteoarthritis and an impingement in his left shoulder.  (R.
299-302).

**ALJ'S DECISION**

In order to establish a disability under the Social
Security Act, a claimant must demonstrate an inability to engage
in any substantial gainful activity due to a medically
determinable physical or mental impairment which can be expected
to result in death or which has lasted or can be expected to
last for a continuous period of not less than 12 months.  See 42
U.S.C. § 423(d)(1).  A claimant is considered unable to engage
in any substantial gainful activity only if his physical or

mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. See 42 U.S.C. § 423(d)(2)(A).

When presented with a claim for disability benefits, an ALJ must follow a sequential evaluation process. See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The process was described by the Supreme Court in Sullivan v. Zebley, 493 U.S. 521 (1990), as follows:

\* \* \*

Pursuant to his statutory authority to implement the SSI Program, (footnote omitted) the Secretary has promulgated regulations creating a five-step test to determine whether an *adult* claimant is disabled. Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). (footnote omitted). The first two steps involve threshold determinations that the claimant is not presently working and has an impairment which is of the required duration and which significantly limits his ability to work. See 20 C.F.R. §§ 416.920(a) through (c)(1989). In the third step, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work. See 20 C.F.R. pt. 404, subpt. P, App. 1 (pt. A)(1989). If the claimant's impairment matches or is "equal" to one of the listed impairments, he qualifies for benefits without further inquiry. § 416.920(d). If the claimant cannot qualify under the listings, the analysis proceeds to the fourth and fifth steps. At these steps, the inquiry is whether the claimant can do his own past work or any other work that exists in the national economy, in view of his age, education, and work experience. If the claimant cannot do his past work or other work, he qualifies for benefits.

\* \* \*

14

493 U.S. at 525-26.

The claimant bears the burden of establishing steps one through four of the sequential evaluation process for making disability determinations.  At step five, the burden shifts to the Commissioner to consider "vocational factors" (the claimant's age, education and past work experience) and determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy in light of his or her RFC.  Ramirez v. Barnhart, 372 F.2d 546, 550-51 (3d Cir.2004).

With respect to the ALJ's application of the five-step sequential evaluation process in the present case, steps one and two were resolved in Plaintiff's favor: that is, the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 26, 2008, the alleged onset date of disability, and the medical evidence established that Plaintiff suffers from the following severe impairments: multiple musculoskeletal conditions including status-post bilateral hip replacement, bilateral arthritis of the shoulders, left shoulder impingement, left rotator cuff tendinitis and tendinitis of the hands.  (R. 18).

Turning to step three, the ALJ found that Plaintiff's impairments were not sufficiently severe to meet or equal the requirements of any impairment listed in 20 C.F.R., Pt. 404,

Subpt. P, App. 1, and, in particular, Listing 1.00, relating to the musculoskeletal system.  (R. 19-20).

Before proceeding to step four, the ALJ assessed Plaintiff's RFC, concluding that Plaintiff retained the RFC to perform sedentary work with a sit/stand option that does not involve extended reaching, strenuous repetitive handling (meaning jobs requiring a grip strength over 70 pounds) or exposure to temperatures under 35 degrees.[18]  (R. 20-28).  The ALJ then proceeded to step four, finding that Plaintiff is unable to perform his past relevant work as a plasterer.  (R. 28).

Finally, at step five, considering Plaintiff's age, education, work experience, RFC and the VE's testimony, the ALJ found that Plaintiff could perform other work existing in the national economy, including the jobs of a telephone solicitor, a cashier and a ticket seller.  (R. 28-29).

**STANDARD OF REVIEW**

The Court's review of the Commissioner's decision is limited to determining whether the decision is supported by substantial evidence, which has been described as "such relevant

---

[18] Under the Social Security Regulations, "sedentary work" involves "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. §§ 404.1567(a), 416.927(a).

evidence as a reasonable mind might accept as adequate to
support a conclusion." Richardson v. Perales, 402 U.S. 389, 401
(1971). It consists of something more than a mere scintilla,
but something less than a preponderance. Dobrowolsky v.
Califano, 606 F.2d 403, 406 (3d Cir.1979). Even if the Court
would have decided the case differently, it must accord
deference to the Commissioner and affirm the findings and
decision if supported by substantial evidence. Monsour Medical
Center v. Heckler, 806 F.2d 1185, 1190-91 (3d Cir.1986).

**DISCUSSION**

Plaintiff asserts the ALJ erred by failing to adequately
explain the reason for his apparent rejection of Dr. Helkowski's
opinion that Plaintiff's shoulder problems precluded him from
performing jobs that required *any* reaching, handling and
fingering. After consideration, the Court finds Plaintiff's
argument unpersuasive.

First, in his decision, the ALJ did not state that he
accepted Dr. Helkowski's RFC assessment of Plaintiff following
the consultative examination in its entirety and then proceed to
ignore the doctor's reaching, handling and fingering RFC
assessment. Rather, the ALJ stated that he accepted Dr.
Helkowski's opinion "in general," and, as a result, he limited
Plaintiff to sedentary work with a sit/stand option. Second,
although the ALJ did not specifically discuss the basis for his

implicit rejection of Dr. Helkowki's assessment of Plaintiff's
RFC to reach, handle and finger immediately following his
discussion of her consultative examination, the Court knows of
no requirement that he do so and a review of the entire decision
reveals the evidence on which the ALJ relied in finding that
Plaintiff was only precluded from performing jobs that involved
*extended* reaching and *strenuous* handling.

In particular, the ALJ noted that Plaintiff's treatment by
Dr. Rogal for shoulder pain in December 2007 had been
conservative, i.e., he was instructed to take over the counter
ibuprofen for pain, stretch, apply heat for stiffness and ice
for overactivity and avoid activities which aggravated his
shoulders (R. 22); an Emergency Room record in June 2008
indicated Plaintiff was treated for lime in his left eye which
he reported occurred while he was renovating his girlfriend's
house (R. 27); the physical examination of Plaintiff by Dr.
Helkowski in October 2008 revealed (a) 5/5 strength throughout
Plaintiff's upper extremities (including deltoids, biceps, wrist
extensors and flexors, and hand intrinsics), (b) 4/5 grip
strength bilaterally, and (c) normal fine dexterity in the
bilateral hands (R. 26); during his office visit with Dr.
Tranovich in December 2008, Plaintiff reported *episodic* shoulder
pain and tenderness which was exacerbated by overhead activity
and movement (R. 23); in January 2010, Dr. Rogal's treatment of

18

Plaintiff's shoulder pain remained conservative, i.e., he was instructed to stretch to avoid a frozen shoulder, apply heat for stiffness and ice for overactivity, avoid strenuous physical mechanical activity and take ibuprofen (R. 27); and, finally, there are significant gaps in Plaintiff's treatment for shoulder pain (R. 27).

In sum, the Court finds that the ALJ's implicit rejection of Dr. Helkowski's assessment of Plaintiff's RFC to reach, handle and finger was adequately explained by his discussion of the evidence in the administrative record regarding the nature of Plaintiff's treatment for shoulder pain and reported activity.  Further, as noted by the ALJ, "mild-to-moderate pain or discomfort is not necessarily incompatible with the performance of sustained work activity at appropriate levels of exertion.  The fact that the claimant experiences pain and discomfort on the job does not compel a finding of disability." (R. 25).  See Welch v. Heckler, 808 F.2d 264, 270 (3d Cir.1986)(Substantial evidence supported conclusion of Appeals Council that claimant's pain did not prevent him from engaging in sedentary work); Dumas v. Schweiker, 712 F.2d 1545, 1553 (2d Cir.1983)(Disability requires more than the mere inability to work without pain.  To be disabling, pain must be so severe, by itself or in combination with other impairments, to preclude any substantial gainful activity).  Based on the foregoing, the

Commissioner's decision denying the applications of Plaintiff for DIB and SSI is affirmed.

William L. Standish
United States District Judge

Date: April 24, 2012